UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CELIA MARIE HOLMES,

                Plaintiff,

        - against -

ANDREW SAUL, Commissioner of Social
Security,[1]

             Defendant.

--------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-2238 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Celia Marie Holmes brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),

seeking judicial review of the decision made by the Commissioner of the Social Security

Administration ("SSA") denying her claim for Social Security Disability Insurance Benefits

("DIB"). Before the Court are the parties' cross-motions for judgment on the pleadings. Plaintiff

seeks an order reversing the Commissioner's decision and directing that she be awarded benefits

or, in the alternative, remand of this matter for further administrative proceedings. The

Commissioner asks the Court to affirm the denial of Plaintiff's claim. For the reasons that follow,

the Court grants Plaintiff's motion for judgment on the pleadings, denies the Commissioner's

cross-motion, and remands this matter for further administrative proceedings.

---

[1] Andrew Saul became Commissioner of the Social Security Administration on June 17,
2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted as Defendant
in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is
a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is
pending. The officer's successor is automatically substituted as a party."); *see also* 42 U.S.C.
§ 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding
any change in the person occupying the office of Commissioner of Social Security or any vacancy
in such office."). The Clerk of Court is respectfully directed to update the docket accordingly.

## BACKGROUND

### I.    Procedural History

On October 27, 2015, Plaintiff filed an application for DIB, alleging disability beginning on July 15, 2010.[2] (Administrative Transcript ("Tr."),[3] Dkt. 8, at 10.) On January 20, 2016, Plaintiff's application was initially denied. (*Id.* at 10, 80–85.) Plaintiff then filed a request for a hearing before an ALJ. (*Id.* at 88–89.) On February 8, 2018, Plaintiff appeared with counsel before ALJ Timothy Belford. (*Id.* at 28–69.) In a decision dated April 5, 2018, the ALJ determined that Plaintiff was not disabled under the Social Security Act (the "Act") and was not eligible for the benefits for which she had applied. (*Id.* at 7–22.) On February 20, 2019, the ALJ's decision became final when the Appeals Council of the SSA's Office of Disability Adjudication and Review denied Plaintiff's request for review of the decision. (*Id.* at 1–6.) Thereafter, Plaintiff timely[4] commenced this action.

---

[2] At the February 8, 2018 hearing before the administrative law judge ("ALJ"), Plaintiff's counsel amended Plaintiff's onset date to January 1, 2013. (Tr., at 64.) As Plaintiff's counsel and the ALJ discussed, however, this does not affect her retroactive award of benefits. (*Id.* at 63.)

[3] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

[4] According to Title 42, United States Code, Section 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing, *inter alia*, 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard, the Court determines that Plaintiff received the Commissioner's final decision on

## II.     The ALJ's Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. *Id.* If the answer is no, the ALJ proceeds to the second step to determine whether the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled. In this case, the ALJ found that Plaintiff suffers from the following severe impairments: "degenerative disc disease of the lumbar and cervical spine; asthma; sarcoidosis; and peripheral neuropathy (20 CFR 404.1520(c))." (Tr., at 12.) The ALJ determined that Plaintiff's hyperthyroidism, carpal tunnel syndrome bilaterally, sleep apnea, and pain of the left hip and thoracic spine were non-severe impairments. (*Id.* at 13.) The ALJ then progressed to the third step and determined that Plaintiff's severe impairments did not meet or medically equal "the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)"—the Listings. (*Id.*) Moving to the fourth step, the ALJ found that Plaintiff maintained the residual functional capacity ("RFC")[5] to perform

_____

February 25, 2019, and Plaintiff filed the instant action on April 16, 2019—50 days later. (*See generally* Complaint, Dkt. 1.)

     [5] To determine the claimant's RFC, the ALJ must consider the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

[s]edentary work[6] as defined in 20 CFR 404.1567(a) except: she can tolerate no more than occasional pushing or pulling with the lower extremities in performing foot control operations. She can tolerate no more than frequent use of the upper extremities for pushing, pulling, reaching, handling, or fingering. She can tolerate no more than occasional overhead reaching; climbing of ramps or stairs, balancing, stooping, crawling, kneeling, or crouching; and can never climb ladders, ropes, or scaffolds. Lastly, she can tolerate no more than occasional exposure to temperature extremes, humidity, and pulmonary irritants.

(*Id.* at 13–14.) Based upon this RFC finding, the ALJ determined that Plaintiff was capable of performing her past relevant work as a customer service representative. (*Id.* at 17.) The ALJ accordingly concluded that Plaintiff was not disabled. (*Id.* at 18.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (internal quotation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation and alterations omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required

---

[6] According to the applicable regulations,

[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation omitted). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of an ALJ's decision." (internal quotation omitted)). Ultimately, the reviewing court "defer[s] to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and, "[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld," *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014).

## DISCUSSION

Plaintiff argues that (1) her spinal impairment meets or equals the severity of Listing 1.04A, which pertains to spinal disorders (Memorandum of Law in Support of the Plaintiff's Motion ("Pl.'s Mot."), Dkt. 9-1, at 7–10); (2) the ALJ failed to adhere to the treating physician rule (*id.* at 11–13); and (3) Plaintiff's non-exertional impairments of chronic pain and fatigue limit her range of sedentary work so much that a finding of disability is appropriate (*id.* at 13–14). The Court finds that remand is warranted on the first two bases, as the record contains conflicting evidence regarding the severity of Plaintiff's spinal impairment, and the ALJ did not accord sufficient weight to the opinion of Plaintiff's treating physician. On remand, the ALJ should also more carefully consider Plaintiff's non-exertional impairments.

## I.   Step-Three Severity Finding

Each Listing sets out "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). A plaintiff seeking to establish that

her impairments meet or equal the severity of an impairment in the Listings must establish that she "satisfies all of the criteria of that listing, including any relevant criteria in the introduction." *Id.*; *accord Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). An ALJ is not necessarily required to set out why a plaintiff has not met the requirements of a Listing so long as "other portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *McIntosh v. Berryhill*, No. 17-CV-5403 (ER) (DF), 2018 WL 4376417, at *22 (S.D.N.Y. July 16, 2018) (quoting *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982)), *report and recommendation adopted*, 2018 WL 4374001 (S.D.N.Y. Sept. 12, 2018). Here, Plaintiff bears the burden to "demonstrate that [her] disability [meets] all of the specified medical criteria of a spinal disorder." *Id.* at *18 (quoting *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (summary order) (second alteration in original)).

A.     **Listing 1.04A: Disorders of the Spine**

Listing 1.04A, which applies to disorders of the spine, provides for disability where an individual's spinal disorder "result[s] in compromise of a nerve root (including the cauda equina) or the spinal cord," with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]" 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 1.04, 1.04A.

In his decision, the ALJ determined that "the medical record does not show evidence of nerve root compression, spinal arachnoiditis,[7] or lumbar spinal stenosis,[8]" and that, while the record "certainly shows the presence of degenerative disc disease of the cervical and lumbar spine that causes some limitations on [Plaintiff's] physical functioning, the specific findings required by the listing are not demonstrated.  Therefore, the undersigned finds that neither of [Plaintiff's] cervical nor lumbar impairments meet or equal Listing 1.04." (Tr., at 13.) The Commissioner specifically argues that Plaintiff has not provided sufficient evidence of motor loss accompanied by sensory or reflex loss, per the requirements of Listing 1.04A. (Memorandum of Law in Support of the Commissioner's Cross Motion ("Def.'s Br."), Dkt. 12, at 20–21.) The Court considers each requirement of Listing 1.04A in turn.

### 1.        Nerve Root Compression and Pain

The Court notes, first, that the ALJ was mistaken in finding that the record evidence did not indicate Plaintiff's nerve root compression.[9]  On February 2, 2013, Plaintiff underwent a cervical MRI that revealed herniated discs, including disc herniations at C2-3 "causing mild midline cord deformity," at C3-4 causing "mild left cord deformity and left C4 root compression," and at C4-5 causing "mild right anterior cord deformity and right C5 root compression."  (Tr., at

---

[7] "Spinal arachnoiditis is a condition characterized by adhesive thickening of the arachnoid which may cause intermittent ill-defined burning pain and sensory dysesthesia, and may cause neurogenic bladder or bowel incontinence when the cauda equina is involved." *Spinal disorders— Spinal arachnoiditis*, 3 Soc. Sec. L. & Prac. § 42:178 (February 2020).

[8] "Lumbar spinal stenosis is a condition that may occur in association with degenerative processes" and may "manifest[] by chronic nonradicular pain and weakness, and result[] in inability to ambulate effectively." *Spinal disorders—Lumbar spinal stenosis*, 3 Soc. Sec. L & Prac. § 42:179 (February 2020).

[9] Indeed, the Commissioner's brief acknowledges the ALJ's error in this regard. (*See* ("Def.'s Br."), Dkt. 12, at 20.)

369–70.)  On June 9, 2014, another cervical MRI noted a disc herniation at C4-5 causing "right anterior cord flattening" and "right C5 root impingement," as well as mild-to-moderate disc herniations at C2-3, C3-4, C5-6, and C7-T1.  (*Id.* at 241.)  Yet another cervical MRI on March 26, 2015 confirmed the desiccation of "all cervical intervertebral discs" and a herniated disc at C5-6 that "impinges on the spinal cord."  (*Id.* at 270–71.)

Plaintiff also presented with symptoms of neuro-anatomic distribution of pain, beginning with her initial evaluation by her treating physician, Mark A. Nelson, D.O., on January 20, 2011.  (*See id.* at 440–41 (noting "a chief complaint of low back pain . . . with pain radiating down [Plaintiff's] left leg greater than the right leg particularly when she is sitting or walking distance").)  Plaintiff complained of worsening pain over time.  Her treatment notes describe "lumbosacral spine[] positive tenderness" on April 15, 2011 (*id.* at 426), April 25, 2012 (*id.* at 395), and December 19, 2012 (*id.* at 373); "chronic low back pain with worsening symptoms" on June 3, 2013 (*id.* at 358); "cervical degenerative disc disease with radiculopathy" on January 8, 2014 (*id.* at 315); "chronic back pain[,]. . . arm tingling and numbness and pain" on October 2, 2014 (*id.* at 287); and "worsening low back pain with radicular symptoms" on October 6, 2015 (*id.* at 245).  Plaintiff's pain is corroborated by additional records from her pain management specialist, Robert Iadevaio, M.D., dated March 1, 2012 to September 22, 2015 (*id.* at 471–91), as well as updated records from Dr. Nelson in the period from January 22, 2016 through September 27, 2017 (*id.* at 664–702).

### 2.    Limitation of Motion of the Spine

The record contains numerous findings of Plaintiff's limited motion of the spine.  For example, on September 27, 2017, Dr. Nelson noted "[l]umbosacral spine, increased tone and diminished range of motion."  (*Id.* at 670.)  He had also noted Plaintiff's "diminished range of

8

motion" in her spine on January 22, 2016 (*id.* at 701) and October 2015 (*id.* at 244). Treatment notes from Dynamic Care Physical Therapy, to which Dr. Nelson referred Plaintiff, also noted pain in various movements of Plaintiff's spine in August 2012 (*id.* at 384–85); a prior physical therapy evaluation sent to Dr. Nelson in March 2011 indicates that Plaintiff's "[f]orward bending in standing is restricted and painful in midline lumbar spine" (*id.* at 436).

### 3.   Motor Loss and Sensory or Reflex Loss

Listing 1.04A requires "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss[.]" 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 1.04, 1.04A. As documented in the record, Plaintiff's motor results indicated muscle weakness and were noted as "5-/5 bilaterally, mild proximal weakness in bilateral lower extremities, possibly related to pain" as well as "[u]pper extremities with mild weakness in right hand grip" on September 27, 2017 (*id.* at 670), June 2, 2017 (*id.* at 673), May 1, 2017 (*id.* at 677), and similarly as "5-/5 in bilateral legs, left weaker than right, possibly related to pain" on January 13, 2017 (*id.* at 680), October 17, 2016 (*id.* at 687), July 13, 2016 (*id.* at 684), April 11, 2016 (*id.* at 695), January 22, 2016 (*id.* at 701), and January 7, 2016 (*id.* at 698). There is, however, some conflicting evidence with regard to Plaintiff's motor loss, as Dr. Iadevaio's motor evaluations indicate "5 / 5 Upper Extremity, Lower Extremity" on July 22, 2014 (*id.* at 477) and May 27, 2014 (*id.* at 479).

The record also indicates some sensory loss, if only mild. Dr. Nelson repeatedly noted muscle stretch reflexes as "[l]ower extremities +1, . . . upper extremity is +2" with sensation as "[g]rossly within normal limits," but with "[m]ild diminished sensation in the left leg." (*Id.* at 671 (September 27, 2017), 673 (June 2, 2017), 695 (April 11, 2016), 698 (January 7, 2016).)

### 4.    Positive Straight Leg Raising Test

The record documents positive straight leg raising (SLR) tests on May 27, 2014 (*id.* at 479) and in March 2012 (*id.* at 380). Plaintiff also had negative SLR tests in December 2015 (*id.* at 495), August 2015 (*id.* at 488), and on July 22, 2014 (*id.* at 478).

### B.    Appropriateness of Remand

Remand is appropriate with respect to the Listings if the district court is "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ[.]" *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 483 (S.D.N.Y. 2018) (collecting cases); *see also Rivera v. Astrue*, No. 10-CV-4324 (RJD), 2012 WL 3614323, at *11–12 (E.D.N.Y. Aug. 21, 2012) (remanding for further administrative proceedings where the ALJ failed to proffer specific rationale for plaintiff not having met the Listing requirements and where the ALJ's rationale was not evident from the balance of the evidence). The possibility that a plaintiff's impairments do not meet or equal the requirements of Listing 1.04A "does not relieve the ALJ of his obligation to discuss the potential applicability of Listing 1.04A, or at the very least, to provide plaintiff with an explanation of his reasoning as to why plaintiff's impairments did not meet any of the listings." *Norman v. Astrue*, 912 F. Supp. 2d 33, 81 (S.D.N.Y. 2012) (citations omitted).

Given the conflicting evidence as to whether Plaintiff's impairments met the requirements of Listing 1.04A, the Court finds that the ALJ not only erred in finding that Plaintiff's impairments did not meet the requirements, but also did not provide a sufficient explanation of his reasoning. *See McIntosh*, 2018 WL 4376417, at *23 (recommending remand "[i]n the absence of an explanation of the conflicting evidence as to Listing 1.04(A)"). As discussed *supra*, the ALJ was simply incorrect in concluding that "the medical record does not show evidence of nerve root

10

compression, spinal arachnoiditis,[10] or lumbar spinal stenosis." (Tr., at 13.) Rather, and as acknowledged by the Commissioner, there are several documented instances of Plaintiff's nerve root compression and impingement on the spinal cord. (*See id.* at 241, 270–71, 369–70.) Separately, Plaintiff's June 2014 MRI noted the absence only of "*significant* stenosis" (*id.* at 241 (emphasis added)), and Dr. Nelson affirmatively indicated that lumbar spinal stenosis was present upon examinations of Plaintiff in his December 20, 2017 RFC Assessment form (*id.* at 547).

The ALJ acknowledged that the record "certainly shows the presence of degenerative disc disease of the cervical and lumbar spine that causes some limitations on [Plaintiff's] physical functioning," and then concluded simply that "the specific findings required by [Listing 1.04A] are not demonstrated." (*Id.* at 13.) The ALJ did not more specifically discuss the findings required by Listing 1.04A even though, as discussed *supra*, the record indicates that some conflicting evidence exists as to whether Plaintiff's impairment met these requirements. Moreover, after reviewing the record, the Court does not find that substantial evidence exists to support the ALJ's conclusion that Plaintiff's spinal impairment did not meet or equal the requirements of Listing 1.04A, especially as the record contains contradictory evidence of Plaintiff's motor loss and SLR tests. *See Sava v. Astrue*, No. 06-CV-3386 (KMK) (GAY), 2010 WL 3219311, at *4 (S.D.N.Y. Aug. 10, 2010) (remanding case where there was not "sufficient uncontradicted evidence in the record to provide substantial evidence for the conclusion that [p]laintiff failed to meet [S]tep [T]hree"). Accordingly, the Court concludes that remand is warranted on this basis.

---

[10] The Court does not address spinal arachnoiditis, as Dr. Nelson's RFC Assessment did not indicate that this condition was present on examination or testing. (*See id.* at 547.)

## II.     Treating Physician Rule

"With respect to the nature and severity of a claimant's impairments, the SSA recognizes a treating physician rule[11] of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation, brackets, and citations omitted). Under the treating physician rule, a treating source's opinion is given "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2). If the opinion of the treating physician is not given controlling weight, the ALJ must apply a number of factors in order to determine the opinion's proper weight. *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). These factors include: (i) the frequency of examination as well as the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating source's opinion; (iii) the extent to which the opinion is consistent with the record as a whole; (iv) whether the treating source is a specialist; and (v) other relevant factors. *See* 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6).

### A.     Treating Physician's Opinion

In his decision, the ALJ considered the RFC assessment of Plaintiff's treating physician Dr. Nelson (*see* Tr., at 547–48) but afforded it "little weight" and determined that "[Dr. Nelson's] opinion is conclusory and exaggerated when compared to his own treatment notes as well as the

---

[11] Although "[t]he current version of the [Act]'s regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, as the current regulations only "apply to cases filed on or after March 27, 2017." *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); *see also* 20 C.F.R. § 404.1520(c). Because Plaintiff's claim was filed on October 27, 2015, the treating physician rule applies.

12

other medical records in the record" (*id.* at 17). The Court finds that the ALJ erred in according such little weight to Dr. Nelson's opinion, in violation of the treating physician rule.

Plaintiff has been under the consistent care of Dr. Nelson since January 20, 2011, on which date she complained of low back pain radiating down both of her legs. (*Id.* at 440.) Plaintiff has since had more than 30 examinations with Dr. Nelson. (*See id.* at 292–460, 664–702.) On March 11, 2011, Plaintiff underwent an electromyography ("EMG") test and nerve conduction study ("NCS") that showed "possible mild, acute on chronic left-sided, L5-S1 radiculopathy." (*Id.* at 431.) Plaintiff reported on April 15, 2011 that her back pain was slightly better but, on examination, continued to demonstrate diminished range of motion in her neck and spine. (*Id.* at 425–26.) Plaintiff presented decreased neck and back range of motion on January 27, 2012 (*id.* at 413–14), April 25, 2012 (*id.* at 395), and July 27, 2012 (*id.* at 390). Plaintiff continued to complain of back pain at her September 18, 2012 examination with Dr. Nelson but said Gabapentin helped her pain. (*Id.* at 376.) Plaintiff was referred for treatment of her neck and lower back pain to Dr. Iadevaio, who administered epidural injections to Plaintiff's spine on April 18, October 17, and December 5, 2012. (*Id.* at 485–87.) These injections only afforded her temporary pain relief; Plaintiff described a "dull ach[ing] throb" and sensation of "walk[ing] on rock[s]" on July 1, 2013, and Dr. Iadevaio diagnosed Plaintiff with lumbar radiculopathy. (*Id.* at 481.) A February 2, 2013 MRI scan of Plaintiff's cervical spine showed, *inter alia*, mild-moderate central disc herniation, C2-C3; mild-to-moderate central and left-sided disc herniation/ridge, C3-4, causing left C4 root compression; mild-to-moderate central and right-sided disc herniation/ridge, C4-5, causing mild right anterior cord deformity and right C5 root compression; and mild left posterolateral bulging disc annulus, C5-6, causing mild thecal sac deformity. (*Id.* at 369.) On March 20, 2013, Dr. Nelson prescribed Neurontin and physical therapy for Plaintiff's ongoing complaints of low back

pain. (*Id.* at 368.) A May 10, 2013 X-ray of Plaintiff's left hip showed calcification of the abductor tendinous insertion at her left hip (*id.* at 360); at a June 17, 2013 examination with Dr. Nelson, Plaintiff was using a cane due to complaints of increased pain (*id.* at 343–44). A June 18, 2013 MRI scan of Plaintiff's lumbar spine showed, *inter alia*, slight left convex lumbar scoliosis, disc desiccation throughout the lumbar spine, and posterior disc bulges at the L2-3 through L5-S1 levels. (*Id.* at 346.) Plaintiff saw Dr. Nelson June 25 and July 22, 2013, complaining of low and mid-back pain with burning sensations, and used a cane due to increased pain. (*Id.* at 334–35, 337–38.) Dr. Nelson prescribed Trileptal and Mobic on August 27, 2013, after Plaintiff again complained of low back and neck pain. (*Id.* at 323–25.) Plaintiff reported to Dr. Nelson on January 20, 2014, that Mobic and Neurontin helped with her back pain. (*Id.* at 310.) Plaintiff continued to use a cane and complain of pain at appointments with Dr. Nelson on February 7 (*id.* at 307) and April 25, 2014 (*id.* at 299). She saw Dr. Iadevaio again on May 27 and July 22, 2014, where the two discussed the risks and benefits of performing epidural injections. (*Id.* at 477–80.) As discussed *supra*, Plaintiff had a positive SLR test on May 27, 2014 and a negative SLR test on July 22, 2014. (*Compare id.* at 479, *with id.* at 478.)

On August 6 and October 2, 2014, Plaintiff continued to complain of neck and back pain; Dr. Nelson recommended that she continue Gabapentin and follow up with pain management. (*Id.* at 287, 289, 292, 294.) Plaintiff saw Dr. Nelson on February 10, 2015, complaining of back pain, bilateral hip pain, and tingling in her legs (*id.* at 282), and on March 9, 2015, complaining of numbness in her back and stomach (*id.* at 275). On March 26, 2015, MRI scans showed, *inter alia*, minimal degenerative disease in Plaintiff's thoracic spine (*id.* at 269), several disc bulges in her cervical spine, C5-6 disc herniation that impinged the spinal cord, and minimal degenerative disease in her cervical spine (*id.* at 271). Dr. Nelson reported on April 1, 2015 that, according to

14

the MRI, Plaintiff's thoracic spine showed multilevel degenerative disc disease and that her cervical spine showed degenerative disc disease without evidence of significant stenosis. (*Id.* at 265.) He prescribed Prednisone, Gabapentin, Lidoderm, and Trileptal. (*Id.* at 267.) On June 22, 2015, Plaintiff reported that her mid-thoracic back pain was "much better" and complained of low back pain; Dr. Nelson advised that she continue on Gabapentin and Trileptal, and prescribed Lidoderm patches. (*Id.* at 261, 263.) On August 3, 2015, Dr. Nelson prescribed Gabapentin and Cymbalta in response to Plaintiff's complaints of low back pain radiating down her legs. (*Id.* at 255, 257.)

An August 22, 2015 MRI scan of Plaintiff's lumbar spine showed an L2-3 disc bulge causing a small ventral impression upon the thecal sac, L3-4 through L5-S1 disc bulges impinging upon the thecal sac, minimal scoliosis, and degenerative disease. (*Id.* at 252.) An August 26, 2015 EMG study showed mild, sensory, axonal peripheral neuropathy in Plaintiff's lower extremities and mild, acute, left L5-S1 radiculopathy. (*Id.* at 246.) Plaintiff returned to Dr. Nelson on October 6, 2015, complaining of low back pain; Dr. Nelson increased her dosage of Gabapentin and prescribed physical therapy. (*Id.* at 243, 245.) Plaintiff saw Dr. Nelson for follow-up visits from January 2016 through October 2016, at which she continued to use a cane and was found to have decreased cervical and lumbar spine range of motion and mildly diminished sensation in her left leg. (*See id.* at 684, 687, 695, 698–99, 701.)

Plaintiff saw Dr. Nelson on January 13, 2017 with a complaint of bilateral leg paresthesias.[12] (*Id.* at 679.) Upon examination, Dr. Nelson found diminished range of motion in the cervical and lumbar spine, 5-/5 motor strength with the left leg weaker than right "possibly

---

[12] Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (*e.g.*, burning, pricking); [it] may be due to lesions of both the central and peripheral nervous systems." *Paresthesia*, STEDMAN'S MEDICAL DICTIONARY 653800 (November 2014).

related to pain," and "mild diminished sensation in the left leg." (*Id.* at 680–81.) A February 1, 2017 x-ray of Plaintiff's lumbar spine showed "multilevel degenerative disc changes seen most significantly at the lower lumbar levels" and "degenerative changes of the facet joints seen most significantly at the L3-L4 and L4-L5 levels." (*Id.* at 514.) On May 1, 2017, Dr. Nelson again found Plaintiff to have decreased cervical and lumbar spine ranges of motion, and mildly diminished sensation in her left leg. (*Id.* at 677–78.) A May 20, 2017 EMG/NCS of Plaintiff's upper extremities showed mild right sensory demyelinating[13] median nerve neuropathy at the wrist, left sensorimotor demyelinating ulnar nerve neuropathy at the elbow, and bilateral mild, acute C5, C6, and C7 radiculopathy. (*Id.* at 664.) Plaintiff saw Dr. Nelson for follow-up visits on June 2 and September 27, 2017, at which Dr. Nelson again noted diminished cervical and lumbar spine ranges of motion, mild proximal weakness in her bilateral lower extremities "possibly related to pain," mild weakness in right-hand grip, and mildly diminished sensation in her left leg. (*Id.* 669–73.)

In his December 20, 2017 medical statement, Dr. Nelson wrote that Plaintiff was totally disabled. (*Id.* at 547.) While the Court agrees with Defendant that Dr. Nelson's conclusion as to Plaintiff's disability status is a decision "reserved to the Commissioner, and as such [is] not entitled to any special significant weight" (*see id.* at 17 (citing 20 C.F.R. § 404.1527(d))),[14] the Court nevertheless finds that the ALJ erred where he otherwise discounted the substance of Dr. Nelson's various findings over his many years of examining Plaintiff. *See, e.g.*, *McIntosh*, 2018 WL

---

[13] Demyelination is the "[l]oss of myelin with preservation of the axons or fiber tracts." *Demyelination*, STEDMAN'S MEDICAL DICTIONARY 235430 (November 2014).

[14] "[The ALJ is] responsible for making the determination or decision about whether [a claimant] meet[s] the statutory definition of disability. . . . A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [an ALJ] will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(d)(1).

4376417, at *26 ("What remains for consideration, though, are the other opinions expressed by [the treating physician] over time, including his opinions as to Plaintiff's specific impairments and functional limitations[.]").   Dr. Nelson indicated that Plaintiff exhibited "[n]euro-anatomic distribution of pain," "[l]imitation of motion of the spine," a "[n]eed to change position more than once every two hours," "[c]hronic nonradicular pain and weakness," and the "[i]nability to ambulate effectively[.]"   (*Id.* at 547.) Dr. Nelson also indicated that Plaintiff experienced "[m]otor loss (muscle weakness or atrophy with associated muscle weakness)."   (*Id.* at 548.)   Dr. Nelson went on to note that Plaintiff suffered from "[e]xtreme" pain, that she could only stand for 15 minutes at one time, sit for 60 minutes at one time, lift 5 pounds on an occasional basis, lift no pounds on a frequent basis, and never bend or stoop (*id.* at 547)—findings that the ALJ seemingly gave no weight to in determining that Plaintiff could perform sedentary work that could include, *inter alia*, lifting up to 10 pounds and an unspecified amount of sitting, walking, and standing (*see id.* at 13–17).   Dr. Nelson further indicated that Plaintiff could only rotate her neck to the right or left and elevate her chin "[t]o a limited extent."   (*Id.* at 548.)

In light of the record evidence discussed *supra*, the Court finds that the ALJ's decision to accord little weight to Dr. Nelson's opinion, and the ALJ's assessment that "the medical evidence pertaining to [Plaintiff's] physical health reveals essentially normal findings throughout" (id. at 16) are not supported by substantial evidence.   In making such a determination with regard to Dr. Nelson's opinion, the ALJ was required to consider a number of factors such as: (1) the length of Plaintiff's treatment relationship with Dr. Nelson and the frequency of Dr. Nelson's examinations of her; (2) the nature and extent of their treatment relationship; (3) the extent to which Dr. Nelson's opinion was supported by medical and laboratory findings; (4) the consistency of Dr. Nelson's opinions with the record as a whole; and (5) whether Dr. Nelson was a specialist.   *See* 20 C.F.R.

§ 404.1527(c)(1)–(6); *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2003) ("[W]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion[.]"). The ALJ instead focused primarily on Dr. Nelson's finding of "total disability." (*See* Tr., at 17 ("No additional diagnostic imaging or testing has been obtained that would support a finding of total disability[.]").) The remainder of Dr. Nelson's assessment was left largely unaddressed; in substance, the ALJ notes only that "[Dr. Nelson's] treatment notes do not reflect the significant restrictions given in his opinion. . . . Diagnostic imaging shows that [Plaintiff's] condition is not significantly limiting and there is no objective evidence indicating that her condition has worsened." (*Id.*) However, the ALJ "is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

On remand, the ALJ should more carefully evaluate Dr. Nelson's findings as to Plaintiff's functionality for consistency with the record medical evidence and should refrain from substituting his own view of the medical proof. Moreover, and to the extent Dr. Nelson's opinion was informed by Plaintiff's subjective complaints of pain, the ALJ should not afford Dr. Nelson's opinion any less weight as a result. Dr. Nelson's reliance on Plaintiff's subjective reports of her chronic pain "hardly undermines his opinion as to [Plaintiff's] functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (internal quotation, alterations, and citation omitted).

### B.    Consultative Examiner's Opinion

In conjunction with the Court's finding that the ALJ erred in according little weight to the opinion of Dr. Nelson, the Court also finds that the ALJ accorded improper weight to the opinion of consultative examiner ("CE") Iqbal Teli, M.D., a doctor of internal medicine.

CE Teli examined Plaintiff once, on December 30, 2015. (Tr., at 15, 493–96.) As relevant to his ultimate RFC determination, CE Teli observed that Plaintiff had "moderate restriction[s]" for squatting, bending, and "overhead activity with both shoulders," as well as "mild restriction[s]" for "twisting or turning [her] neck" and "prolonged standing and walking." (*Id.* at 496.) In his decision, the ALJ acknowledged that CE Teli's opinion was "quite general and does not specifically define the frequency with which [Plaintiff] can engage in [various physical] activities on a regular basis," but nevertheless determined that "Dr. Teli's opinion warrants some consideration because he is an expert in internal medicine with an awareness of the evidence in the record and an understanding of Social Security disability programs and evidentiary requirements." (*Id.* at 16.) The ALJ then accorded "significant weight" to CE Teli's opinion. (*Id.*) This reliance on CE Teli's opinion, especially given the little weight accorded to the opinion of Dr. Nelson, was plainly error.

As a general matter, "a consulting physician's opinions or report should be given limited weight." *Adesina v. Astrue*, No. 12-CV-3184 (WFK), 2014 WL 5380938, at *9 (E.D.N.Y. Oct. 22, 2014) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)). "This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz*, 912 F.2d at 13 (internal quotation and citation omitted). An ALJ "may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence." *Mayor v. Colvin*, No. 15-CV-344 (AJP), 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015). However, an ALJ giving greater weight to a consultative examiner's opinion should document his rationale for finding that the

consultative examiner's conclusions are more consistent with the underlying evidence. *See Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015).

Here, the ALJ's rationale for according significant weight to CE Teli's opinion is clearly insufficient. The ALJ acknowledges that CE Teli's opinion is "quite general and does not specifically define the frequency with which the claimant can engage" in certain physical activities. (Tr., at 16.) Yet, notwithstanding this observation, the ALJ not only concludes that CE Teli's opinion "warrants some consideration," but accords it "significant weight," with almost no explanation for that decision. (*Id.*) In light of the case law discussed *supra*, the ALJ's reliance on CE Teli's opinion at the very least requires a more thorough rationale and is likely altogether misplaced. On remand, the ALJ should apply the proper legal standards in deciding what weight to give CE Teli's opinion and explain the rationale behind that decision.

## III.    Plaintiff's Non-Exertional Impairments

Plaintiff also argues that the ALJ erroneously found that Plaintiff was able to perform the full range of sedentary work given her non-exertional limitations of chronic pain and fatigue. (Pl.'s Br., Dkt. 9-1, at 13–14.) As the Court has determined that this matter should be remanded for further administrative proceedings, the Court directs the ALJ to more carefully consider on remand Plaintiff's subjective assessments of her chronic pain and fatigue.

Plaintiff's hearing testimony provides abundant detail of the limitations placed upon her daily activities by her chronic pain and various physical impairments. (*See, e.g.*, Tr., at 35 ("[W]hen I'm sitting, I'm pinching my nerves, you know, running down my feet, and then when I get up, if I'm sitting all day, then it affects my feet, and then I have problems walking. It's very painful.").) An ALJ cannot "reject the claimant's statements about the intensity and persistence of her pain or other symptoms or about the effect her symptoms have on her ability to work solely

20

because the available objective evidence does not substantiate the claimant's statements." *Hudson v. Berryhill*, No. 17-CV-463 (MAT), 2018 WL 4550310, at *6 (W.D.N.Y. Sept. 21, 2018) (internal alterations, quotation, and citation omitted). Rather, the ALJ must consider the additional factors set forth in 20 C.F.R. § 404.1529(c)(3) in assessing Plaintiff's testimony and deciding its proper weight. Here, the ALJ found that, "[a]lthough [the medical evidence] is consistent in outlining [Plaintiff's] subjective complaints of pain, it is equally consistent in showing few objective signs to support those complaints." (Tr., at 14.) On remand, the ALJ should more carefully evaluate the medical evidence discussed *supra* in determining whether it is consistent with Plaintiff's subjective complaints of pain.

## CONCLUSION

For the reasons set forth above, the Court denies the Commissioner's cross-motion for judgment on the pleadings and grants Plaintiff's motion. The Commissioner's decision is remanded for further considerations consistent with this Memorandum and Order. The Clerk of Court is respectfully requested to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  June 17, 2020
        Brooklyn, New York